IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016


**STATE OF TENNESSEE v. HOLLIS FISK, JR.**


**Appeal from the Circuit Court for Warren County**
**No. 14-CR-311     Larry B. Stanley, Jr., Judge**

_____


**No. M2015-01552-CCA-R3-CD – Filed August 2, 2016**

_____


This is Defendant's, Hollis Fisk, Jr., direct appeal of his robbery conviction and accompanying eight-year sentence in confinement. He argues that the evidence is insufficient to support the conviction and that the trial court abused its discretion in determining the length of his sentence and by denying an alternative sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

John P. Partin, District Public Defender, and Susan N. Marttala (on appeal), Assistant Public Defender; and Bud Sharp (at trial), McMinnville, Tennessee, for the appellant, Hollis Fisk, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Stephen Crump, District Attorney General; and Thomas Miner, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**


*Procedural History and Factual Summary*

Defendant was indicted by the Warren County Grand Jury for aggravated kidnapping, robbery, and assault. The following evidence was presented at trial.

On May 25, 2014, around 11:00 p.m., Will Dunlap and his friend, Nathan McDowell, went to Walmart to see Mr. Dunlap's ex-girlfriend, Shaneeka Pleasant. The two friends found Ms. Pleasant in the store with her close friend and roommate, Jasmine Blevins. Ms. Pleasant and Ms. Blevins lived in an apartment on Underwood Road with their children and Ms. Blevins's mother. While the two women were shopping, Ms. Blevins's mother was waiting with their children in her car.

Mr. Dunlap, Mr. McDowell, Ms. Pleasant, and Ms. Blevins walked around inside the store while the women shopped. Eventually, Mr. McDowell became bored. He borrowed Mr. Dunlap's phone and went outside to wait in his car.

When the women finished shopping, Mr. Dunlap accompanied them to the checkout line. In front of them, Mr. Dunlap noticed a former classmate of his, Lashaie Wright, and her boyfriend, Brandon Bradley. The couple began whispering to each other when they saw Mr. Dunlap and left the store after they finished checking out. According to Mr. Dunlap, Mr. McDowell borrowed twenty dollars from Mr. Bradley the previous day.

After Ms. Wright and Mr. Bradley left the store, Defendant approached Ms. Pleasant in the checkout line and asked if Mr. Dunlap was "with" her and Ms. Blevins. Ms. Pleasant answered no, and Defendant turned to engage Mr. Dunlap. According to Mr. Dunlap, Defendant "kind of got in [his] face," and inquired about the money that Mr. McDowell had borrowed from him. Defendant told Mr. Dunlap to talk to him outside when he finished checking out. Ms. Pleasant saw a "little weird look" on Mr. Dunlap's face, but she did not hear what the two men were saying to each other.

Mr. Dunlap testified that he did not know Defendant personally, but he expected Mr. McDowell to return the money and resolve the issue. After Defendant exited the store, Mr. Dunlap texted Mr. McDowell from Ms. Pleasant's phone and notified him that Defendant was at the store and wanted his money.

Once Ms. Pleasant and Ms. Blevins were finished checking out, Mr. Dunlap went with them toward the store's main exit, but he then decided to use a different doorway because he wanted to avoid an encounter with Defendant. Although Mr. Dunlap did not think there would be any issue with returning the money, he felt uncomfortable because Defendant had tried to intimidate him and because Mr. McDowell had not responded to the text message.

When Ms. Pleasant and Ms. Blevins got outside, Defendant asked them where Mr. Dunlap was, and they said he was still inside the store. Defendant then asked the two women to come to his car. Ms. Pleasant declined, explaining that Ms. Blevins's mother

was waiting for them in the car with their children. The two women returned to their car and then drove to their apartment complex.

After checking the exit in the gardening section of the store, Mr. Dunlap discovered that all of the other doors were closed because it was so late. Mr. Dunlap returned to the main exit and left the store. As he entered the parking lot, Defendant called to Mr. Dunlap. As. Mr. Dunlap walked toward Defendant, Mr. Bradley approached Defendant from behind. When Defendant again inquired about the borrowed money and began "using intimidation," Mr. Dunlap denied being involved with the matter. Defendant threatened to put Mr. Dunlap in the trunk of a nearby car and instructed Mr. Dunlap to empty his pockets. . Mr. Dunlap complied and turned over his wallet, which contained his driver's license, his social security card, and a one dollar bill. Defendant emptied the wallet and returned it to Mr. Dunlap. Mr. Dunlap did not consent to Defendant's taking his belongings, but he did not attempt to stop Defendant because he "was scared."

After taking Mr. Dunlap's wallet, Defendant ordered Mr. Dunlap to sit inside the car. Defendant corralled Mr. Dunlap into the backseat of the car and used his body to block the doorway of the car so that Mr. Dunlap did not feel that he could exit the vehicle. Mr. Dunlap felt like he was "stuck" in the situation and feared that the two men would chase him if he ran away. Defendant then told Mr. Dunlap that he had twenty-four hours to return the borrowed money or else Defendant would go to Mr. Dunlap's house. Defendant said that he knew how to find Mr. Dunlap from the information on his driver's license.

Eventually, Mr. Dunlap was able to leave the vehicle, and he began walking away to look for Mr. McDowell. However, Defendant told him that "he wasn't just going to let [him] walk away so that [he] could call the cops." Mr. Dunlap explained to Defendant that he no longer had a ride home because Mr. McDowell was gone and said that he was just going to leave and walk home. Defendant said that he would take Mr. Dunlap home, and Mr. Dunlap returned to the vehicle. Mr. Dunlap "kind of felt like [he] was still stuck in this situation" and was still too afraid to try to run away. Mr. Dunlap sat between Mr. Bradley and Ms. Wright in the back of the car. Defendant was in the driver's seat and a woman unknown to Mr. Dunlap was in the passenger seat.

Mr. Dunlap thought they were going to take him home, but Defendant drove in a different direction. They left the highway and began driving down Underwood Road in an area that was sparsely inhabited and without street lights. Mr. Dunlap was afraid and felt that his "life was in danger." After driving a bit, Defendant stopped the car and turned off the headlights. Defendant instructed Mr. Bradley and Mr. Dunlap to get out of the vehicle. As soon as Mr. Dunlap put his feet on the road, Defendant hit him in the face. Mr. Dunlap immediately ran away, and Defendant and Mr. Bradley chased him for

about fifty feet before returning to their car. Mr. Dunlap ran until he came to a house with an illuminated porch light. An "old couple" let Mr. Dunlap inside to use the phone, and he called his mother. While inside the house, Mr. Dunlap thought he saw the car he had been in pass by once.

Several minutes after Ms. Pleasant and Ms. Blevins returned to their apartment, while they were unloading their groceries, Defendant drove up in a car. He and Ms. Wright got out of the vehicle, and Defendant began talking to Ms. Blevins's mother. Ms. Blevins took the children inside the apartment but her mother and Ms. Pleasant remained outside. Defendant approached Ms. Pleasant and asked if Mr. Dunlap was in her vehicle. Ms. Pleasant said he was not, and Defendant explained that he had "seen him running towards that way." Defendant was "mad" and cursing. He opened the trunk of his car and said something about a gun, but Ms. Pleasant did not see a weapon. Later, Ms. Pleasant called the police.

Officer Joseph Van Bommel of the McMinnville Police Department was dispatched to the apartment and interviewed Ms. Pleasant. Her police report was more detailed than her testimony at trial. Ms. Pleasant told Officer Van Bommel that they were approached by Defendant and Mr. Bradley at the checkout line. Defendant told Mr. Dunlap that he knew that Mr. Dunlap had stolen twenty dollars from his sister and then told the group that he wanted to talk to them outside of the store. After exiting the store, Ms. Pleasant saw Defendant order Mr. Bradley to go watch a different side of the Walmart. Defendant then told Ms. Pleasant to wait in the parking lot, but she and Ms. Blevins decided to leave.

Ms. Pleasant also told Officer Van Bommel that, when Defendant, Mr. Bradley, and Ms. Wright showed up at their apartment looking for Mr. Dunlap, Defendant told her that he knew Mr. Dunlap was there because "he had just knocked him out on Underwood Road near the nursery." Defendant mentioned a gun in the trunk, but Ms. Wright told him not to get the gun, and she shut the trunk.

Ms. Pleasant reported that after the group left, she noticed that they had a bag of items from the store that did not belong to them. Ms. Blevins's mother drove Ms. Pleasant and Ms. Blevins back to Walmart to return the items, but while they were on the way, they saw Defendant and the others waiting in their vehicle at the intersection of Underwood Road and Bybee Branch Road. Ms. Pleasant and the others then returned to their apartment because they were scared that Defendant's group might try to get inside the apartment while they were gone.

Mr. Dunlap waited for over half an hour until his mother and stepfather arrived to pick him up. When Mr. Dunlap's parents picked him up, he appeared "scared" and was visibly shaken. There were dirt stains on the knees of his shorts, and Mr. Dunlap's

stepfather noticed that Mr. Dunlap's face was somewhat swollen on the right side. After receiving the blow, Mr. Dunlap's jaw hurt so badly that he could not chew solid food for two or three weeks. Mr. Dunlap's stepfather confirmed that his stepson complained of difficulty chewing for several weeks after the incident. Mr. Dunlap's stepfather testified that his stepson was born with fetal alcohol syndrome, which caused Mr. Dunlap to sometimes have "trouble" with "chronological orders of how things play out" and which also sometimes caused Mr. Dunlap to not react to situations the way ordinary people would.

Mr. Dunlap's stepfather called the police, and Mr. Dunlap filed a police report. Officer Van Bommel interviewed Mr. Dunlap and his father. Mr. Dunlap complained that the left side of his chin was hurting, but Officer Van Bommel did not see any physical signs of injury.

Detective Todd Rowland of the McMinnville Police Department obtained and reviewed the security video footage from Walmart, some of which was entered into evidence.[1] The footage showed that Defendant first entered the store at 11:16 p.m. and then exited thereafter at 11:18 p.m. accompanied by Mr. Bradley and Ms. Wright. Defendant and Mr. Bradley re-entered the store a few seconds later without Ms. Wright. Defendant went into the store while Mr. Bradley remained in the breezeway separating the store and the parking lot. Defendant then returned to the breezeway, and the two men exited.

Ms. Pleasant and Ms. Blevins left the store around 11:21 p.m. without Mr. Dunlap. The women talked to Mr. Bradley for a few moments in the parking lot and then left. Defendant motioned to Mr. Bradley who left the main entrance and went to another side of the store. Defendant returned to the main entrance and re-entered the store at 11:22 p.m. Defendant then exited the store at 11:24 p.m. Mr. Dunlap exited the store at 11:25 p.m. and walked into the parking lot. Defendant and Mr. Bradley approached Mr. Dunlap, and then the three of them walked several yards to a parked white vehicle. The security video footage does not depict what happened on the passenger side of the vehicle. However, after a few minutes, Mr. Bradley got into the car through the driver's side back door. Defendant and Mr. Dunlap then walked back to the front of the store and looked around before having a conversation. They returned to the white vehicle and got inside. Defendant was the driver. The vehicle left the parking lot at 11:30 p.m.

Detective Rowland interviewed Mr. Bradley about the incident, and Mr. Bradley denied being at Walmart until Detective Roland showed him still images from the security footage. Upon seeing the images, Mr. Bradley "started making excuses about

---

[1] Detective Rowland testified that Walmart did not provide him with electronic copies of all of the security video footage that he reviewed at the store.

that nothing happened." Mr. Bradley was not available to testify at trial because he was deceased.

Defendant offered the testimony of his grandmother, Emma Winton, and his fiancé, Krisshina Huddleston. Ms. Winton testified that she asked Defendant, Mr. Bradley, and Ms. Wright to go to the store to get items for a cookout.

Ms. Huddleston said that they took her car to Walmart that night and that she stayed in the vehicle the entire time. Ms. Huddleston was paying attention to her phone so she did not see much happening in the parking lot, but she saw Ms. Pleasant and Ms. Blevins at one point. Ms. Huddleston acknowledged that Mr. Dunlap showed up at her car and sat in the back seat on the rear side. Mr. Dunlap and Ms. Wright had a discussion about Mr. Dunlap's owing Ms. Wright twenty dollars, during which Mr. Dunlap "pulled his wallet out and showed that he had no money in his wallet." Ms. Huddleston denied that anyone took anything from Mr. Dunlap. According to Ms. Huddleston, while Mr. Dunlap was discussing the issue with Ms. Wright, Defendant was talking to a man parked next to them in a Corvette and was not involved in the discussion about the borrowed money.

At one point, Mr. Dunlap left the car but returned shortly, and he explained that his ride was gone and offered money in exchange for a ride. Mr. Dunlap asked to be taken to Ms. Pleasant's apartment. During the drive, Mr. Dunlap and Mr. Bradley argued about the twenty dollars while in the back seat. Mr. Dunlap said that he would get the twenty dollars from Ms. Pleasant. The argument got heated between the two men, and Mr. Dunlap asked them to stop the car. Mr. Dunlap got out of the vehicle and "took off running." Ms. Huddleston denied that anyone hit Mr. Dunlap and testified that the headlights on her car are controlled automatically and cannot be turned off at night by the driver.

According to Ms. Huddleston, after Mr. Dunlap ran away from the vehicle, they drove to Ms. Pleasant's apartment to look for Mr. Dunlap because Ms. Wright still wanted to get her twenty dollars back from him. Ms. Huddleston denied that they drove around Underwood Road searching for Mr. Dunlap.

After a *Momon* hearing, Defendant elected not to testify.

After hearing all of the proof, the jury convicted Defendant of false imprisonment, a Class A misdemeanor, as a lesser included offense of aggravated kidnapping, and the jury also convicted Defendant as charged of robbery, a Class C felony, and assault, a Class A misdemeanor. The trial court determined that Defendant was a Range II offender and imposed sentences of eleven months and twenty-nine days for both misdemeanors and an eight-year sentence for the felony. The trial court ordered

restitution, denied an alternative sentence, and ordered all sentences to be served concurrently.

*Analysis*

On appeal, Defendant argues that the evidence is insufficient to support his robbery conviction and that the trial court abused its discretion by imposing an excessive sentence and by denying alternative sentencing for the robbery.

A. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains and exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). One acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). One acts knowingly with regard to conduct when the person is aware of the

nature of that conduct, and one acts knowingly with regard to the results of conduct "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

Defendant maintains that the evidence is insufficient to support the jury's finding that Defendant intended to steal the contents of Mr. Dunlap's wallet and that he did so by putting Mr. Dunlap in fear. We disagree. In the light most favorable to the State, the proof showed that the victim was in the checkout line when approached by Defendant who asked about the money that Defendant had loaned to Mr. McDowell and told the victim to meet him outside. The victim attempted to leave the store by a means other than the main entrance, but the other doors were locked due to the lateness of the hour. As the victim exited the store, Defendant and another man approached him and escorted him to a car with two other people inside. The victim testified that Defendant intimidated him and threatened to put him in the trunk of the car. Defendant ordered the victim to empty his pockets, and the victim produced his wallet. Defendant grabbed the victim's wallet, removed the driver's license, the social security card, and a dollar bill, and then returned the wallet. Defendant did not return the items he took from the victim's wallet. The victim testified that he did not consent to the taking of his belongings and that he did not resist Defendant because he was scared of Defendant. Defendant ordered the victim to get inside the car. The victim testified that he felt that he was stuck in the situation and was afraid that he would be pursued if he tried to flee. The victim sat down in the passenger side backseat of the car, and Defendant used his body to block the victim from leaving the car. Defendant then threatened to go to the victim's house if the money in question was not returned within twenty-four hours.

Defendant suggests that the evidence shows that he was looking for Defendant's address rather than intending to steal. Although there was testimony about Defendant's interest in the victim's address, the evidence also established that Defendant wanted money from the victim to satisfy a small debt to someone. Defendant took those three items from Mr. Dunlap's wallet and did not give them back. Additionally, Defendant declared his intention to keep the driver's license so that he could use it to locate the victim if the money was not repaid. Under these circumstances, a rational jury could infer that Defendant intended to deprive the victim of control of these three items. Thus, the evidence is sufficient to support a jury finding of the requisite mens rea.

With regard to the sufficiency of the evidence for the fear element, Defendant's argument primarily rests on the fact that Mr. Dunlap never attempted to flee from or otherwise disengage from the encounter. Our supreme court has explained that "[t]he 'fear' referred to in the statute is a 'fear of "bodily danger or impending peril to the person," which intimidates and promotes submission to the theft of the property.'" *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008) (quoting *State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001)). This Court has previously observed:

Putting the victim in fear of bodily injury is sufficient intimidation to sustain a charge of robbery. However, actual fear of such injury need not be proved, since a legal presumption of fear will arise from facts clearly indicating a cause therefor. It is not necessary that the victim should have feared bodily injury if he did not resist, it being sufficient if he feared it in the event he should resist . . . [.]

The fear of bodily injury sufficient to support a charge of robbery may be aroused by a word, or gesture, as where the victim is threatened with a gun or knife. Even a slight cause of fear or indirect language of a threatening character may be sufficient to constitute intimidation, and the victim may be deemed to have been put in fear if the transaction is attended with such circumstances of terror as in common experience are likely to create an apprehension of danger and induce a man to part with his property for the sake of his person.

*Sloan v. State*, 491 S.W.2d 858, 861 (Tenn. Crim. App. 1972) (internal quotation omitted). Whether a victim was put in fear under the totality of the circumstances is a question for the jury. *See Dotson*, 254 S.W.3d at 395-96; *State v. Witherspoon*, 648 S.W.2d 279, 280-81 (Tenn. Crim. App. 1983). Proof of resistance was not required, and the evidence in this case, as described above, is sufficient for a rational jury to find that Defendant robbed the victim by putting him in fear of injury if he resisted the demand for his wallet. Defendant threatened to put the victim in the trunk of the car, and the victim specifically testified that he complied with the demand for his wallet because he was scared of Defendant. The victim further testified that he was afraid to flee from the entire situation. Because there is sufficient evidence to support his conviction for robbery, Defendant is not entitled to relief.

## B. Sentencing

Defendant argues that the trial court abused its discretion by failing to impose the minimum sentence for his robbery conviction and also argues that the trial court erred by not imposing an alternative sentence of split confinement. The State disagrees.

In *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012), the Tennessee Supreme Court determined that when reviewing a trial court's sentencing decision, appellate courts will apply "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of [the] Sentencing Act." The same abuse of discretion standard with a presumption of reasonableness is also applied to a trial court's decision regarding alternative sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

An abuse of discretion exists upon the finding of improper logic and reasoning "viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Moore*, 6 S.W.3d 235 (Tenn. 1999). The appellant has the burden of proving that a sentence is improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court has complied with the statutory scheme, appellate courts may not modify the sentence, even if a different result is preferred. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

A trial court must consider the following factors in both determining a defendant's specific sentence and potential qualification for alternative sentencing: "(1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing." T.C.A. § 40-35-210(b) (2010). We note that even "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. The sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

"The court shall impose a sentence…determined by whether the defendant is a mitigated, standard, persistent, career or repeat violent offender." T.C.A. § 40-35-210(c). In this case, the trial court, without any objection by the defense, classified Defendant as a Range II offender. The sentencing range for robbery, a Class C felony, committed by a Range II offender is six to ten years. T.C.A. § 40-35-112(b)(3).

Although Defendant's eight-year sentence is within the applicable range, he argues that any sentence above the minimum would be an abuse of discretion given the factual circumstances of this case in that the amount of property taken was nominal. In other words, Defendant maintains that his sentence is inconsistent with the purposes and principles of our sentencing scheme because his eight-year sentence for robbery is "greater than that deserved for the offense committed." T.C.A. § 40-35-103(2). However, from the record we conclude that the trial court honored the purposes and principles of the Sentencing Act when deciding the length of Defendant's sentence. The trial court considered the various factors set forth in Tennessee Code Annotated section 40-35-210(b) and properly considered both the submitted enhancement and mitigating factors. Although the factual circumstances attending the commission of the robbery in this case were relatively mild, the trial court found that Defendant's "previous history of

criminal convictions or criminal behavior," T.C.A. § 40-35-114(1), was a substantial enhancement factor that outweighed any asserted mitigating factors. Because the record supports the application of this enhancement factor, the trial court did not abuse its discretion in determining the length of Defendant's within-range sentence. The presumption of reasonableness will prevail when "[t]he trial court [considers] all of the criteria set out in section -210(b); it [imposes] a sentence within the applicable range; it [sets] forth its reasons for imposing the sentence that it did; and the relevant findings are adequately supported by the record." *Carter*, 254 S.W.3d at 346. Defendant's sentence is proper, and he is not entitled to relief on this basis.

Defendant further contends that the trial court erred in denying an alternative sentence. Tennessee Code Annotated section 40-35-104 authorizes alternative sentences, which may include a sentence of confinement that is suspended upon a term of probation or a sentence of continuous or periodic confinement in conjunction with a term of probation. T.C.A. § 40-35-104(c)(3)-(5). A defendant is eligible for probation if the sentence imposed is ten years or less. T.C.A. § 40-35-303(a). Although "probation shall be automatically considered by the court as a sentencing alternative for eligible defendants," the defendant bears the burden of "establishing suitability" for probation. T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

A defendant who is sentenced as an especially mitigated or standard offender and who has committed a Class C, D, or E felony should be "considered as a favorable candidate for alternative sentencing options," if certain conditions are met. T.C.A. § 40-35-102(5), (6)(A). However, the guidelines regarding favorable candidates are advisory. T.C.A. § 40-35-102(6)(D). In this case, Defendant was convicted of a Class C felony, but he was not classified as an especially mitigated or standard offender; therefore, he was not a favorable candidate for alternative sentencing.

Additionally, Tennessee Code Annotated section 40-35-103 requires that sentences involving confinement be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

T.C.A. § 40-35-103(1).

When considering whether an alternative sentence was appropriate for Defendant, the trial court considered the purposes and principles of the Sentencing Act. The trial court evaluated the nature of Defendant's previous convictions, finding a pattern of "bully-ish" behavior. The trial court observed that this behavior by Defendant was unlikely to be rehabilitated, and when paired with the current convictions of false imprisonment, robbery, and assault, posed a danger to the community. Also, the trial court determined that confinement was needed to avoid depreciating the seriousness of the offense and to deter future similar behavior. The trial court was concerned that Defendant had received probationary sentences in the past and continued to reoffend. On that point, Defendant argues that the bulk of his previous criminal offenses occurred when he was a young adult and should militate in favor of leniency. However, those offenses were still relevant to Defendant's history of criminal conduct, and the trial court did not abuse its discretion by considering them. Additionally, the trial court found that Defendant's incarceration is in the best interest of protecting society.

In its logic and reasoning, the trial court did not wholly depart from the purposes and principles of the Sentencing Act. The trial court cited to the evidence presented at trial and the presentence report when considering the fundamental sentencing purposes and principles. The trial court did not abuse its discretion in determining the length or manner of service of Defendant's sentence for his robbery conviction. The punishment fits the crime and he is not entitled to relief.

*Conclusion*

Based on the foregoing, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE

-12-